DANIEL L. WARSHAW (Bar No. 185365)
  *dwarshaw@pwfirm.com*
MICHAEL H. PEARSON (Bar No. 277857)
  *mpearson@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

JILL M. MANNING (Bar No. 178849)
  *jmanning@pwfirm.com*
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, California 94111
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK DOYLE, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>TESLA, INC.,<br><br>                Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

991168.5

Plaintiff Patrick Doyle ("Plaintiff"), on behalf of himself and the Class defined below, brings this action against Tesla, Inc. ("Tesla" or "Defendant") and alleges the following based on personal knowledge, and as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.     Consumers of vehicles with internal combustion engines have multiple options for maintaining and repairing their vehicles after purchase: they can purchase parts and perform the work themselves, go to an authorized dealership, or visit an independent repair facility.

2.     However, Tesla owners, like Plaintiff, have only one option for service and maintenance of their Tesla vehicles: to schedule service at a Tesla service center. Thus, Tesla owners are uniquely subject to lengthy wait times to obtain an appointment, and are forced to pay supracompetitive prices for maintenance and repair services ("Tesla Service") and replacement parts ("Tesla Parts").

3.     Tesla abuses its monopoly power in the electric vehicle market to restrain competition and charge supracompetitve prices for Tesla Services and Tesla Parts in the United States. Tesla accomplishes this by (i) requiring that Tesla vehicles be diagnosed by tools that can only be accessed by Tesla, (ii) placing conditions on Tesla vehicles that are designed to discourage owners from servicing and/or maintaining their Tesla vehicles anywhere other than at a Tesla service center, and (iii) limiting access to tools, data, and Tesla Parts that owners, such as Plaintiff, need to maintain and/or repair their Tesla vehicles.

4.     This antitrust class action seeks relief pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2302, *et seq.*, for current and former owners of Tesla vehicles, including Plaintiff and the Class, who have been forced to pay supracompetitive prices and suffer excessive wait times to maintain and repair their Tesla vehicles as a result of Tesla's monopolization, attempted monopolization, tying, exclusionary conduct, and restraint of the markets for Tesla Parts and Tesla Services.

5.     As a result of this anticompetitive conduct, Tesla has prevented independent providers from entering the Tesla Service market, prevented its original equipment manufacturer

("OEM") parts manufacturers from producing Tesla Parts for anyone other than Tesla, and prevented market entry by non-OEM Tesla Parts manufacturers. As a direct and proximate result of this conduct, Tesla has caused Tesla vehicle owners to suffer exorbitant delays in repairing and maintaining their vehicles, only to pay supracompetitive prices for those Tesla Parts and Tesla Services once they are finally provided.

6.      Tesla's unlawful monopoly of the Tesla Service and Tesla Parts markets should be enjoined. Further, Tesla should be required to make its repair and diagnostic tools available to individuals and independent repair shops at a reasonable cost, and Plaintiff and the Class should be reimbursed for the amounts they overpaid for Tesla Service and Tesla Parts.

7.      Accordingly, Plaintiff, on behalf of himself and all others similarly situated, seeks declaratory and injunctive relief, damages, costs, and attorneys' fees to the extent permissible by law.

## JURISDICTION AND VENUE

8.      This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, Sections 102(c) and 110(d) of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2302(c) and 2310(d). It is brought on behalf of Plaintiff and a Class of similarly situated individuals numbering more than 100, at least one of whom is a citizen of a state different from the state in which Tesla is domiciled, and with an amount in controversy exceeding $5,000,000, exclusive of interest and costs.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

10.     This Court has personal jurisdiction over Tesla because it was headquartered in this District for most of the relevant time period (it has since moved to Austin, Texas as more fully discussed below), a substantial portion of the vehicles it has sold to consumers are located within this District, and it continues to maintain a factory in this District. Thus, the conduct complained of herein caused injury to persons throughout the United States, but particularly within this District, and a substantial portion of the conduct complained of took place in this District.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

11.     Venue is proper under 15 U.S.C. §§ 15(a) (Clayton Act) and 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391 (general venue provision). Tesla transacts substantial business within this District, maintains significant operations, including a factory, in this District, and conducts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

## DIVISIONAL ASSIGNMENT

12.     Pursuant to Civil Local Rule 3-2(c) and General Order No. 44, venue for this antitrust action is proper in any courthouse in this District. Given that Tesla's engineering headquarters are located in Alameda County and Plaintiff resides in San Mateo County, Plaintiff requests assignment in the San Francisco Division or Oakland Division pursuant to Civil L.R. 3-2(d).

## PARTIES

### I.     Plaintiff

13.     Plaintiff Patrick Doyle is an adult citizen of the state of California who resides in Millbrae, California. Plaintiff purchased a 2015 Tesla Model S and has paid Tesla for Tesla Service and/or Tesla Parts during the Class Period (as defined below).

### II.     Defendant

14.     Defendant Tesla is a multinational automotive and clean energy company founded in Palo Alto, California in 2003. By 2014, Tesla had become the largest automotive employer in the State of California.[1] In December 2021, Tesla moved its headquarters to Austin, Texas.[2] However, Tesla maintains manufacturing facilities in Fremont, California, where it produces the Model S, Model 3, Model X, and Model Y.[3] At a press conference held with California's Governor in February 2023, Tesla's CEO Elon Musk announced that Tesla was returning Tesla's engineering

---

[1]    *See*    https://www.caranddriver.com/news/a15365435/tesla-wins-california-is-now-the-states-largestauto-employer/ (last accessed March 27, 2023).

[2] *See* https://www.tesla.com/en_eu/giga-texas (March 27, 2023).

[3] *See* https://www.tesla.com/manufacturing (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  headquarters to California and stated, "We're a California-Texas company," and that it is "kind of
2  a dual-headquartered company."[4]

3      15.     Tesla manufactures the foundational electric components of its vehicles, including
4  electric motors/drive units, battery packs, and chargers. The other components (*e.g.*, ordinary car
5  parts, various electronic parts, and raw materials) are purchased from suppliers around the world.[5]
6  Many components are acquired from a single source.[6] Some component suppliers (exclusive or not)
7  enter into contracts with Tesla that, among other things, provide that all tooling, supplies, and
8  materials used by the supplier to manufacture parts for Tesla are owned by Tesla. In addition to
9  manufacturing vehicles and parts, Tesla, among other things, operates 170 service centers across the
10  United States, 44 of which are in California.[7]

11  ## FACTUAL ALLEGATIONS

12  **I.     The History of Electric Vehicles**

13      16.     Electric vehicles have been contemplated for over 100 years. Thomas Edison and
14  Henry Ford worked together to produce an electric vehicle following the success of the Model T in
15  1908.[8] However, while the Model T cost $650 at the time, an electric roadster cost more than double,
16  $1,750.[9] Inexpensive gas, among other reasons, doomed electric cars, and by 1935 they all but
17  disappeared.[10]

18      17.     Soaring oil prices and gasoline shortages – peaking with the 1973 Arab Oil
19  Embargo – created a growing interest in lowering the United States' dependence on foreign oil and

20

21  ---
22  [4]  *See*  https://www.cnbc.com/2023/02/22/elon-musk-meets-with-california-gov-newsom-at-teslas-engineering-hq.html (March 27, 2023).

23  [5]  *See*  https://www.investopedia.com/ask/answers/052815/who-are-teslas-tsla-main-suppliers.asp (last accessed March 27, 2023).

24  [6]  *See*  https://www.sec.gov/Archives/edgar/data/1318605/000156459016013195/tsla-
25  10k_20151231.htm (March 27, 2023).

26  [7] *See* https://www.tesla.com/findus/list/services/United+States (last accessed March 27, 2023).

      [8] *See* https://www.energy.gov/articles/history-electric-car (last accessed March 27, 2023).
27  [9] *Id.*

28  [10] *Id.*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  finding alternative sources of fuel. As a result, Congress passed the Electric and Hybrid Vehicle
2  Research, Development, and Demonstration Act of 1976, authorizing the Energy Department to
3  support research and development in electric and hybrid vehicles.[11]

4       18.    Around the same time, automakers began exploring options for alternative fuel
5  vehicles, including electric cars. For example, General Motors developed a prototype for an urban
6  electric car that it displayed at the Environmental Protection Agency's First Symposium on Low
7  Pollution Power Systems Development in 1973, and the American Motor Company produced
8  electric delivery jeeps that the United States Postal Service used in a 1975 test program. Even NASA
9  helped raise the profile of the electric vehicle when its electric Lunar rover became the first manned
10  vehicle to drive on the moon in 1971.[12]

11       19.    However, the real-world limitations on Earth – limited top speeds and rage – once
12  again doomed the electric car.

13       20.    The passage of the 1990 Clean Air Act Amendment and the 1992 Energy Policy
14  Act – plus new transportation emissions regulations issued by the California Air Resources Board
15  ("CARB") which required the major automobile suppliers in the United States to offer electric
16  vehicles in order to continue sales of their gasoline powered vehicles in California – helped create
17  a renewed interest in electric vehicles in the United States.

18       21.    Soon thereafter, GM introduced the cult-favorite EV1 and Toyota introduced the
19  hybrid Prius.[13] Alternative fuel vehicles, including electric, were finally catching on as a viable
20  substitute for gas-powered vehicles.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

1

## II.    Tesla's Entry into the Electric Vehicle Market

2      22.     In 2003 Tesla was founded as a Silicon Valley startup by engineers Martin Eberhard

3  and Marc Tarpenning.[14] From 2004 to 2008, Tesla grew substantially and developed its first

4  automobile, the Roadster.

5      23.     In 2008, Musk became the company's CEO and product architect, positions he still

6  holds today (although the latter position has since been renamed "Technoking").[15]

7      24.     In 2010, Tesla received at $465 million loan from the Department of Energy's Loan

8  Programs Office – a loan that was highly controversial at the time, but one that Tesla repaid a full

9  nine years early – to establish a manufacturing facility in California.

10      25.     The company opened its manufacturing plant in Fremont, California, a 5.3 million

11  square-foot factory that was previously owned by Toyota and General Motors, which includes two

12  paint facilities and 1.5 miles of assembly lines.

13      26.     When the Model S premiered in 2013, it received a near-perfect score of 99 out of

14  100 from Consumer Reports, which also named it as "easily the most practical electrical car we've

15  tested."[16] By September 2014, the car hit all-time sales records for electric vehicles in the United

16  States with 2,500 sold in just one month, and in Q1 2015, sales reached a new high at 10,030 sold.[17]

17  Between 2015 and 2022, Tesla sold over 329,000 Model X vehicles in the United States.[18]

18

19

20

21

22

23  ───────────────

[14]    *See*    https://www.investopedia.com/articles/personal-finance/061915/story-behind-teslas-
24  success.asp (last accessed March 27, 2023).

[15] *See* https://ir.tesla.com/corporate/elon-musk (last accessed March 27, 2023).
25
[16]    *See*    https://www.consumerreports.org/cro/magazine/2013/07/tesla-model-s-review/index.htm
26  (last accessed March 27, 2023).

27  [17]    *See*    https://www.investopedia.com/articles/personal-finance/061915/story-behind-teslas-
success.asp (last accessed March 27, 2023).

28  [18] *See* https://carfigures.com/us-market-brand/tesla/model-x (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

27.     In 2016, Tesla introduced its first mass-market electric vehicle: the Model 3, a mid-size sedan priced around $35,000.[19] In 2019, it unveiled the Model Y, a compact SUV priced at $47,000.[20]

28.     Between 2017 and 2022, Tesla sold over 741,000 Model 3 vehicles in the United States[21] and, between 2020 and 2022, Tesla sold over 292,000 Model X vehicles in the United States.[22]

29.     By October 2022, Tesla had sold over 3 million electric vehicles worldwide,[23] generating over $140 billion in revenue.[24] In the United States alone, Tesla sold approximately 1.5 million electric vehicles between 2015 and 2022.[25]

30.     In a highly concentrated market with incredibly high barriers to entry due to technological development and manufacturing, Tesla positioned itself as one of the few successful independent car companies. Due in large part to Tesla's success, electric vehicle sales have accelerated dramatically in the United States. Electric vehicle registrations in the United States increased over fivefold between 2016 and 2021, from 87,000 per year to 466,000 per year.[26]

31.     In addition to selling electric vehicles, Tesla operates approximately 170 service centers in the United States.[27] According to its Form 10-Ks filed with the United States Securities and Exchange Commission ("SEC"), Tesla has generated about $12 billion in "Services & Other"

---

[19]   *See*     https://www.cnn.com/2022/03/16/cars/tesla-model-3-price-increase/index.html    (last accessed March 27, 2023).

[20]  *See* https://www.theverge.com/2019/3/14/18264446/tesla-model-y-suv-compact-announcement-price-release-date-features-elon-musk (last accessed March 27, 2023).

[21] *See* https://carfigures.com/us-market-brand/tesla/model-3 (last accessed March 27, 2023).

[22] *See* https://carfigures.com/us-market-brand/tesla/model-x (last accessed March 27, 2023).

[23]   *See*  https://cars.usnews.com/cars-trucks/features/how-many-cars-has-tesla-sold  (last accessed March 27, 2023).

[24] Tesla Form 10-Ks for 2015-2021.

[25] *See* https://www.goodcarbadcar.net/tesla-us-sales-figures/ (last accessed March 27, 2023).

[26]   *See*   https://www.iea.org/data-and-statistics/charts/electric-car-registrations-and-sales-share-in-china-united-states-europe-and-other-regions-2016-2021 (last accessed March 27, 2023).

[27] *See* https://www.tesla.com/findus/list/services/United+States (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   Revenue between 2015 and 2021, which includes, among other things, non-warranty after-sales

2   vehicle services, including but not limited to Tesla Service and sales of Tesla Parts.[28]

3     32. The number of Tesla retail and service locations and the number of vehicles in

4   Tesla's mobile service fleet have also grown, but at a much slower pace when compared to the

5   number of Tesla vehicles on the road. This has created a sever bottleneck with regard to the

6   maintenance and service of the Tesla vehicles as discussed herein.

7     33. According to Tesla, one of the key advantages of electric vehicles over gas-powered

8   vehicles is that they require less maintenance and result in fewer repairs. In fact, Tesla has long

9   touted that "[w]ith no regularly required maintenance and fewer moving parts to repair, we design

10  every Tesla vehicle with the goal of eliminating the need for service. Paired with remote diagnostics

11  and over-the-air software updates that regularly improve your car, you'll spend less time in the shop

12  and more time on the road."[29]

13    34. However, according to one recent analysis by J.D. Power, Tesla vehicles experience

14  226 problems per 100 vehicles, whereas gas-powered vehicles, on average, experience 175 problems

15  per 100 vehicles.[30] As a result, Tesla ranks poorly in reliability rankings. JD Power recently found

16  that Tesla had the fourth worst dependability score of all motor vehicle manufacturers.[31] Meanwhile,

17  Consumer Reports recently ranked Tesla second-to-last in reliability.[32]

18  **III. The Right to Repair Movement**

19    35. The "right-to-repair" movement refers to concerted efforts, including proposed and

20  enacted government legislation, aimed at protecting consumers' ability to maintain and repair the

21

22

23  ────────────
    [28] Tesla Form 10-Ks for 2015-2021.

24  [29] https://www.tesla.com/service (last accessed March 27, 2023).

25  [30] *See* https://www.jdpower.com/business/press-releases/2022-us-initial-quality-study-iqs (last accessed March 27, 2023).

26  [31] *See* https://www.jdpower.com/business/press-releases/2021-us-vehicle-dependability-study-vds

27  (last accessed March 27, 2023).

28  [32] *See* https://insideevs.com/news/549130/consumerreports-tesla-reliability-poor-2021/ (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  products they purchase however they see fit, rather than being compelled to utilize the

2  manufacturers' offered services.

3       36.     The first automotive "Right to Repair" legislation was adopted in 2012 when the

4  Massachusetts Legislature enacted the Automotive Right to Repair law, Mass. General Laws c.93K

5  § 2. The following year, facing the potential for a variety of right-to-repair statutes with differing

6  statutory requirements, the Auto Alliance (manufacturers, *except Tesla*) and several aftermarket

7  trade associations entered into a National Memorandum of Understanding "to sell the diagnostic

8  and repair information that manufacturers make available to their dealers to car owners and

9  independent repair shops" and thus creating a broad right to repair motor vehicles across the United

10  States.[33],[34]

11      37.     Notably, however, the National Memorandum of Understanding failed to address

12  telematics – data transmitted wirelessly from the vehicle to the manufacturer. Without access to

13  telematic data, independent repair shops are unable to effectively service today's "connected"

14  vehicles. In response, in or around 2019, various states (including California, Georgia, Hawaii,

15  Illinois, Indiana, Massachusetts, Minnesota, Missouri, Montana, North Dakota, Nevada, New

16  Hampshire, New Jersey, New York, Oregon, South Dakota, Vermont, Virginia, Washington and

17  West Virginia) began considering additional right-to-repair legislation, which Tesla has successfully

18  fought thus far.[35]

19      38.     In addition to limiting access to information, tools, and replacement parts,

20  manufacturers have restricted consumers' ability to self-repair or utilize independent maintenance

21  and repair services by threatening to void vehicle warranties when maintenance and/or repair

22

23

24  [33] *See* https://www.repair.org/automotive (March 27, 2023).

25  [34]*See* Nixing the Fix: An FTC Report to Congress on Repair Restrictions, at p. 45, n.249
   https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-
26  restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (last accessed March 27,
   2023).
27

28  [35]   *See*   https://electrek.co/2020/10/14/tesla-fights-right-to-repair-initiative-over-cybersecurity-
   concerns/ (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   services are performed by anyone other than the authorized dealer. Such threats have a profound

2   impact on consumers.[36]

3       39.   Moreover, manufacturers can restrict consumers from self-repair or utilizing

4   independent maintenance and repair services even when their warranties do not explicitly require

5   that all such services be performed by the manufacturer. This is accomplished by, among other

6   things:

7           a.   Designing products in such a way as to complicate or prevent repairs, or to

8   make independent repairs less safe;

9           b.   Making parts and repair information unavailable;

10          c.   Implementing policies or making statements that steer consumers to the

11  manufacturer's repair networks and to the use of OEM parts;

12          d.   Disparaging non-OEM parts and independent repair;

13          e.   Application of patent rights and enforcement of trademarks;

14          f.   Software locks and firmware updates; or

15          g.   End User License Agreements.[37]

16      40.   Tesla is not the first automotive manufacturer to restrict consumers' ability to

17  maintain and repair the vehicles they purchase by limiting access to tools and components, or

18  otherwise creating barriers designed to hinder independent repair. Many manufacturers, spanning a

19  wide variety of industries, have similarly tried to force purchasers to utilize the manufacturers' own

20  maintenance and repair services.

---

[36]   *See* https://www.nytimes.com/wirecutter/blog/what-is-right-to-repair/ (March 27, 2023); https://www.consumerreports.org/warranties-guarantees/void-car-warranty-by-not-having-car-serviced-at-dealership-a1163841540/.

[37]   *See* Nixing the Fix: An FTC Report to Congress on Repair Restrictions, at p. 6, n.249 https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

41. Manufacturers like Tesla can and do utilize various methods to discourage consumers from maintaining and repairing their vehicles or from having them serviced by independent repair shops.

42. As explained by the U.S. Department of Justice ("DOJ"), such repair restrictions harm consumers in at least three ways:

> (1) "]R]epair restrictions can drive independent repair shops out of business by raising their costs or denying them key inputs, which, in turn, leaves consumers with fewer choices."

> (2) "[M]anufacturers' restrictions can delay repairs" by, among other things, "cut[ting] the number of repair shops available to consumers," thus resulting in "fewer options for their time-sensitive repairs" or otherwise "stymie[ing]" independent repairs.

> (3) "[R]estrictions on repair aftermarkets can raise prices and reduce quality."[38]

43. On July 9, 2021, President Biden issued an Executive Order on "Promoting Competition in the American Economy" which included the following provision:

> (h) To address persistent and recurrent practices that inhibit competition, the Chair of the FTC, in the Chair's discretion, is also encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority, as appropriate and consistent with applicable law, in areas such as:
>
> …
>
> (ii) unfair anticompetitive restrictions on third-party repair or self-repair of items….[39]

44. As acknowledged by the White House's accompanying fact sheet, "[p]owerful equipment manufacturers…use proprietary repair tools, software, and diagnostics to prevent third-parties form performing repairs." Therefore, one reason prompting for the Executive Order was to "[m]ake it easier and cheaper to repair items you own by limiting manufacturers from barring self-

---

[38] Statement of Interest of the United States, ECF No. 118, *In re: Deere & Company Repair Servs. Antitrust Litig.*, No. 3:22-cv-50188 (N.D. Ill. Feb. 13, 2023), at pp. 2-3.

[39] *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (last accessed March 27, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

repairs or third-party repairs of their products," which is why the Executive Order "[e]ncourages the FTC to limit powerful equipment manufacturers from restricting people's ability to use independent repair shops or DIY repairs."[40]

## IV.   Tesla Designs its Vehicles Purposefully to Restrict Owners from Accessing Maintenance and Repair Services and Parts

45.     By designing its vehicles such that repairs require access to remote diagnostics and over-the-air software updates, Tesla effectively limits anyone other than Tesla from being able to provide parts, maintenance and/or repair services for its vehicles.

46.     As described by Tesla in a communication to its investors:

> Our vehicles are designed with the capability to wirelessly **upload data to _us_** via an on-board system with cellular connectivity, **allowing _us_ to diagnose and remedy** many problems before ever looking at the vehicle. When maintenance or service is required, a customer can schedule service by contacting **one of _our_ Tesla service centers** or **_our_ Tesla mobile technicians** can perform an array of services from a customer's home or other remote location.[41]

47.     Indeed, only Massachusetts residents, thanks to its right-to-repair statute (_see_ paragraph 36 above), initially had access to Tesla repair manuals and parts information.

48.     In or around August 2021, Tesla made some of its service manuals available online for an annual subscription costing $3,187.[42] Although this information was later made available for free,[43] diagnostic software still requires an annual subscription of $3,000 per year.[44]

---

[40]   _See_   https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-order-on-promoting-competition-in-the-american-economy/ (last accessed March 27, 2023).

[41] Tesla 2017 Form 10-K at 7 (emphases added).

[42]   _See_ https://insideevs.com/news/587165/tesla-service-manuals-now-free-of-charge-grab-them-while-you-can/ (last accessed March 27, 2023).

[43] _Id._; _see also_ https://service.tesla.com/service-subscription (last accessed March 27, 2023).

[44] _Id._

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

49.     Tesla also has limited access to the Tesla Parts needed to maintain and repair its vehicles. While Tesla did open its parts catalog to the public in 2018,[45] consumers must submit an application to Tesla in order to actually make purchases or even view prices.[46] This application is clearly targeted at professional repair shops (as opposed to individuals, such as Plaintiff), as indicated by questions asking for the "Applicant Shop Physical Address" and "Facility Pictures" including photos of the applicant's "Spray Booth" and "Parts Area."[47]

50.     Further, many parts are listed as "Not for Resale" or "Restricted." More importantly, even if an applicant is ultimately allowed to purchase the Tesla Parts, numerous parts are unavailable.

51.     Tesla further limits consumers from repairing their own vehicles or using independent repair shops is through its warranty and related policies. While Tesla's new vehicle warranties do not expressly require owners to purchase parts and service for their Tesla vehicles only through Tesla's app, they strongly discourage owners from obtaining parts or services anywhere else, or risk voiding their warranties.

52.     Tesla's New Vehicle Limited Warranty for Model S, Model X, and Model 3 vehicles sold in the United States and Canada reads:

> Although Tesla does not require you to perform all service or repairs at a Tesla Service Center or Tesla authorized repair facility, **this New Vehicle Limited Warranty may be voided or coverage may be excluded due to improper maintenance, service or repairs**. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools and supplies with respect to your vehicle and, in certain cases, may employ the only persons or be the only facilities authorized or certified to work on certain parts of your vehicle. **Tesla strongly recommends that all maintenance, service and repairs be done at a Tesla Service Center or Tesla authorized**

---

[45] *See* https://electrek.co/2018/10/29/tesla-parts-catalog-model-3-model-s-model-x-roadster-public/ (last accessed March 27, 2023).

[46] *See* https://epc.teslamotors.com/#/catalogs (last accessed March 27, 2023).

[47] *Id*.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1
2

**repair facility in order to avoid voiding, or having coverage excluded under, this New Vehicle Limited Warranty**.[48]

3
4

53.    Further, the "Frequently Asked Questions" section of Tesla's Vehicle Warranty webpage includes the following:

5

**Do I have to take my vehicle to the Tesla Service Center?**

6
7
8
9
10

With over-the-air software updates, remote diagnostics and the support of our Mobile Service technicians, the need for a Service Center visit is reduced. If your vehicle does require service, you can schedule a service appointment in the Tesla app. **If you choose to take your vehicle to a non-Tesla shop for maintenance or repairs, coverage under your warranty could be affected if problems occur**.[49]

11
12
13
14
15
16
17

54.    The Tesla Parts, Body & Paint Repair Limited Warranty only covers "Tesla branded and manufactured parts purchased directly from Tesla over-the-counter, online or purchased and installed by Tesla Service or Tesla Body Shops."[50] Moreover, labor charges to repair or replace covered parts are only covered under Tesla's parts warranty "[i]f the Part or Used Part was installed by Tesla." The Tesla Parts, Body & Paint Repair Limited Warranty further warns that it will "not cover any damage or malfunction directly or indirectly caused by… improper repair or maintenance, including use of non-genuine Tesla accessories or Parts."[51] It continues:

18
19
20
21
22
23

Although Tesla does not require you to perform all maintenance, service or repairs at a Tesla Service Center or Tesla authorized repair facility, **this Tesla Parts, Body and Paint Limited Warranty may be voided, or coverage may be excluded, due to lack of or improper maintenance, installation, service or repairs**. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools and supplies with respect to Tesla Parts, Body and Paint repairs, and, in certain cases, may employ the only persons, or be the only facilities authorized or certified to work on

24
25
26

[48]    https://www.tesla.com/sites/default/files/downloads/tesla-new-vehicle-limited-warranty-en-us.pdf (last accessed March 27, 2023) (emphases added).

[49]    https://www.tesla.com/support/vehicle-warranty (last accessed March 27, 2023) (emphases added).

27

[50]    *See*   https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last accessed March 27, 2023).

28

[51]  *Id*.

Tesla Parts, Body and Paint. **Tesla strongly recommends that you have all maintenance, service and repairs done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this Tesla Parts, Body and Paint Limited Warranty**.[52]

55.    In addition to the disclaimers and fine print, Tesla emphasizes in no uncertain terms its unlawful restrictions in the owner's manual:[53]



56.    Online forums are replete with stories by of Tesla invalidating warranties or otherwise refusing to honor warranties because Tesla owners had non-OEM parts installed on their vehicles.[54] However, many owners have and continue to yield to Tesla's threats and choose not to use independent repair shops or aftermarket parts for fear of losing warranty coverage.[55]

_____

[52] *Id.*

[53]    https://www.tesla.com/ownersmanual/models/en_us/GUID-ECA7C07B-7944-496B-8FC5-12762BF061F1.html (last accessed March 27, 2023).

[54] *See* https://teslamotorsclub.com/tmc/threads/risky-mods-that-void-warranty.253550/ (March 27, 2023).

[55] *Id.*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

57.     As discussed above, Tesla manufactures some components for its vehicles, while it purchases other components from suppliers around the world. As stated by Tesla itself:

> Our vehicles use over 3,000 purchased parts which we source globally from over 350 suppliers. We have developed close relationships with several key suppliers particularly in the procurement of cells and other key system parts. While we obtain components from multiple sources in some cases, similar to other automobile manufacturers, many of the components used in our vehicles are purchased by us from a single source.[56]

58.     Tesla further restricts the availability of both OEM and non-OEM Tesla Parts by, among other things, requiring at least some its suppliers to enter into *de facto* exclusivity agreements preventing those suppliers from manufacturing parts for anyone other than Tesla. For example, a contract between Tesla and Panasonic filed with the SEC in 2014 states:

> The tooling, jigs, dies, gauges, fixtures, molds, patterns, other equipment (collectively, the "Tooling"), as well as the supplies, materials, and other tangible property that are or will be used by Seller to manufacture, store, and transport Goods, or used to develop or make Goods for Tesla (such Tooling, supplies, materials and other tangible property shall collectively be referred to as "Property") will be owned by Tesla if Tesla has [***] ("Tesla Property").[57]

59.     Such contract provisions are intentionally designed to prevent Tesla's OEM parts suppliers from producing Tesla Parts for anyone other than Tesla. Absent such contract provisions, Tesla's OEM parts suppliers could sell Tesla-compatible parts to parties other than Tesla (*e.g.*, automotive parts distributors), who could then resell them to Tesla owners and independent repair shops, thus promoting competition in the Tesla Parts market.

60.     Given the limited nature of the public access Tesla has granted to its manuals, diagnostic software, and replacement parts, Tesla owners still have few if any options for servicing their vehicles, other than scheduling a service appointment with Tesla.

---

[56] Tesla Motors, Inc. 2015 Form 10-K at p. 9.

[57]   https://www.sec.gov/Archives/edgar/data/1318605/000119312516735804/d253219dex102.htm (last visited March 28, 2023) (redacted portion filed confidentially and unavailable online).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

## ANTITRUST ALLEGATIONS

**I.      Relevant Markets**

**A.      The Geographic Market: The United States**

61.      The relevant geographic market in this case is the United States. Vehicles designed and manufactured to operate on public streets in the United States must meet stringent regulatory requirements that are specific to this country. Accordingly, certain motor vehicles are designed specifically for the United States market, and American consumers generally do not purchase and import motor vehicles designed for use outside the United States, nor are they generally able to.

62.      As it pertains to the Tesla Parts market discussed below, Tesla owners in the United States do not and would not turn to parts manufactured for sale outside the United States due to shipping costs and variations in regulatory requirements such that parts designed for use in foreign markets may not be compatible with parts designed for use in the United States.

63.      As it pertains to the Tesla Service market discussed below, Tesla owners in the United States do not and would not turn to service providers located outside of the United States when servicing their vehicles, as the cost and wait times associated with moving vehicles and parts back and forth between countries would not be economically viable.

**B.      The Electric Vehicle Market**

64.      A relevant market in antitrust cases refers to the set of products or services that customers would switch to in the event of a price increase or quality decrease.

65.      The Electric Vehicle market comprises battery-electric motor vehicles designed and sold to be operated on public streets.

66.      Consumers have many options for transportation in the United States including public transportation options (*i.e.*, busses, trains, etc.) and personal transportation options (*i.e.*, automobiles, bicycles, walking, etc.). With respect to personal automobiles, consumers have a variety of options, including traditional gas-powered vehicles, hybrid-powered vehicles, and electric vehicles.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

67.     People purchase EVs in particular because of their unique attributes, including, among other things, the ability to comfortably transport multiple individuals to specific destinations, located many miles apart, with zero carbon emissions.

68.     The electric vehicle market has experienced significant growth and expansion over the past two decades, led by Tesla.

69.     While Tesla sometimes states that it competes in the "worldwide automotive market," it also acknowledges that electric vehicles are a separate product market by consistently promoting "the development of the electric vehicle market" and touting its superiority and "attractiveness" compared to the gas-powered vehicle market.[58]

70.     Generally, consumers are set on the types of vehicles they purchase. That is why, according to one recent American Automobile Association study, 96% of electric vehicle owners will *only buy another electric vehicle as their next vehicle*.[59] As this study demonstrates, electric vehicle owners (including but not limited to Tesla vehicle owners) do not consider other types of vehicles, including gas- or hybrid-powered vehicles, to be reasonable substitutes for electric vehicles.

71.     When analyzing market definition, federal antitrust enforcement agencies use a tool called a "SSNIP test" whereby they examine whether a hypothetical monopolist could impose a small but significant non-transitory increase in price (a "SSNIP"), typically 5%, without causing a sufficient number of customers to switch to other products or services to render the SSNIP unprofitable to the monopolist.

72.     Electric vehicles generally cost more than similarly equipped gas- or hybrid-powered vehicles. Further, electric vehicle prices have increased at a faster rate.[60] For example, from January

---

[58] *See, e.g.*, Tesla 2021 Form 10-K at 11-12.

[59]  *See* https://www.realsimple.com/work-life/money/money-planning/electric-car-costs (last accessed (last accessed March 29, 2023)); https://newsroom.aaa.com/2020/01/aaa-owning-an-electric-vehicle-is-the-cure-for-most-consumer-concerns/?icid=mag_cars (last accessed March 28, 2023).

[60]  *See* https://www.cnbc.com/2021/12/29/electric-vehicles-are-becoming-more-affordable-amid-spiking-gas-prices.html (last accessed March 28, 2023) (stating that the average EV price is $10,000 higher than average price for all motor vehicles).

1   to May 2022, electric vehicle prices jumped 22%, while other motor vehicle prices increased only

2   14%.[61] Despite the occasional price decrease, Tesla in particular has been able to increase prices

3   over time while steadily increasing overall sales.[62] Thus, Tesla's ability to increase prices without

4   losing sales (let alone increasing sale) supports the conclusion that the electric vehicle market is

5   properly defined.

6       73.   Within the electric vehicle market, Tesla has long held the dominant position. For

7   example, during the first half of 2020, registration data showed that Tesla had nearly 80% market

8   share in the United States.[63] While other companies have since increased their electric vehicle

9   product offerings, Tesla still controls 65% of the domestic Electric Vehicle market, with Tesla's

10  Model 3, Model Y, Model S, and Model X comprising the first, second, fourth, and sixth best-selling

11  electric vehicle in the United States market, respectively.[64]

12      74.   For these reasons, the United States electric vehicle market is its own relevant

13  market, in which Tesla has significant, monopoly market power.

14      C.   The Tesla Parts Market

15      75.   The Tesla Parts market comprises the various parts used to repair and maintain Tesla

16  vehicles.[65]

17      76.   Once consumers have purchased a Tesla vehicle, they are locked into using Tesla

18  Parts specific to their Tesla vehicle when repairing and maintaining it. Unlike with other vehicles,

19  it is difficult, if not impossible, to accurately forecast how much money will need to be spent on

20

21  [61] *See* https://www.businessinsider.com/electric-vehicle-prices-rise-22-percent-fossil-fuel-14-percent-2022-6 (last accessed March 28, 2023).

22
23  [62] *See* https://getjerry.com/electric-vehicles/tesla-increased-prices-across-board#not-teslas-first-price-hike (last accessed March 28, 2023).

24  [63] *See* https://electrek.co/2021/02/16/tesla-owns-electric-car-market-us/ (last accessed March 28, 2023).

25  [64] *See* https://electrek.co/2023/01/09/the-top-10-best-selling-electric-vehicles-in-the-us-of-2022/ (last accessed March 28, 2023).

26
27  [65] While this case is concerned only with Tesla Parts purchased by Class members and not those covered under warranty, Plaintiff contends that Tesla's growth has significantly outpaced its ability to supply Tesla Parts and provide Tesla Service to Tesla's benefit and the detriment of Plaintiff and
28  Class members thereby creating an unlawful restraint of trade. *See* paragraphs 45-59 above.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  Tesla Parts over the lifetime of Tesla vehicle prior to purchase. Compounding this problem here, as

2  discussed herein, Tesla misleadingly represents that its vehicles are more reliable and require less

3  service or attention than other types of vehicles.

4        77.     There are no viable substitutes for Tesla Parts, and most parts are not interchangeable

5  with parts designed for use with other manufacturers' vehicles. Therefore, while the Tesla Parts

6  market is derivative of the electric vehicle market, it also comprises its own distinct product market.

7        78.     Absent the unlawful, anticompetitive conduct complained of herein, the Tesla Parts

8  market would include not only OEM parts sold by someone other than Tesla (*i.e.*, Tesla's suppliers),

9  but also non-OEM or "aftermarket" parts sold by other parts manufacturers. Traditionally in other

10  markets, such as the gas-powered vehicle market, the wide availability of OEM parts and the

11  existence of non-OEM aftermarket parts promotes competition and leads to greater supply, quicker

12  service, and lower prices.

13        79.     However, due to the anticompetitive course of conduct described in this Complaint,

14  consumers have no options other than direct-from-Tesla for Tesla Parts. As a result, consumers in

15  the Tesla Parts market suffer from lack of choice, long wait times, and supracompetitive prices.

16  Indeed, as set forth herein, except for basic maintenance-related parts (*e.g.*, wiper blades, tires),

17  Tesla Parts are exclusively sold through Tesla.

18        80.     Accordingly, Tesla has monopoly market power in the Tesla Parts market.

19        D.     <u>The Tesla Service Market</u>

20        81.     The Tesla Service market comprises various services to repair and maintain Tesla

21  vehicles.

22        82.     The proposed Class includes individuals both whose Tesla vehicles are still covered

23  under warranty and those whose are not.[66] For example, a Tesla vehicle owner would be considered

24

25

26  ───────────────

[66] While this case is concerned only with Tesla Services provided out of warranty, Plaintiff contends
27  that Tesla's growth has significantly outpaced its ability to supply Tesla Parts and provide Tesla
Service to Tesla's benefit and the detriment of Plaintiff and Class members thereby creating an
28  unlawful restraint of trade. *See* paragraphs 45-59 above.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    a Class member if his Model 3 is still covered under warranty, but he nonetheless paid for Tesla

2    Service because a particular repair was deemed by Tesla not to be covered under warranty.

3         83.    There are no viable substitutes for Tesla Service, and they are not interchangeable

4    with service designed for other vehicles. Therefore, while the Tesla Service market is derivative of

5    the electric vehicle market, it also comprises its own distinct product market.

6         84.    Once consumers have purchased a Tesla vehicle, they are locked into repair and

7    maintenance services specific to their Tesla vehicles.[67] Compounding this problem here, as

8    discussed herein, Tesla misleadingly represents that its vehicles are more reliable and require less

9    service or attention than other types of vehicles.

10        85.    Absent the anticompetitive conduct alleged herein, the Tesla Service market should

11   include both services offered by Tesla and services offered by third-party, independent service

12   providers. As history has demonstrated in various other markets, the existence of independent

13   service providers promotes competition and leads not only to more service providers, it also leads

14   to better service and lower prices. As a result, consumers in the Tesla Service market suffer from

15   lack of choice, long wait times, and supracompetitive prices.

16        86.    Indeed, as set forth herein, except for basic maintenance-related parts (*e.g.*, wiper

17   blades, tires), Tesla Service is exclusively provided by Tesla.

18        87.    Accordingly, Tesla has monopoly market power in the Tesla Service market.

19   **II.    Barriers to Entry**

20        88.    Significant barriers to entry exist in the Electric Vehicle, Tesla Parts, and Tesla

21   Service markets which enable Tesla to maintain its monopoly power.

22        89.    As discussed above, all three markets are impacted by complex regulatory and

23   licensing requirements. Moreover, entry into any of the markets at issue here require substantial

24   capital investments in manufacturing facilities and creation of a nationwide distribution network.

25        90.    Most importantly, Tesla's own conduct challenged herein has created substantial

26   barriers to entry into the Tesla Service and Tesla Parts markets. Due to Tesla's anticompetitive and

27

28   _____
     [67] *See* https://www.tesla.com/service (last accessed March 28, 2023).

monopolistic practices, a new entrant in either of these markets would effectively be limited to competing for customers who either were no longer under warranty or were willing and able to risk voiding their vehicle warranties. Moreover, they would need to service those customers without reasonable access to the manuals, diagnostic software, telematic data, and replacement parts necessary to properly service and maintain Tesla vehicles.

### III. Impact: Tesla's Monopolization of the Tesla Service and Tesla Parts Markets has Artificially Inflated Prices, Decreased Supply, and Created Excessive Wait Times

91. The lack of competition in the Tesla Service and Tesla Parts markets caused by Tesla's misconduct has resulted in artificially inflated prices, insufficient supply, and excessive wait times to maintain or repair Tesla vehicles.

92. But for Tesla's anticompetitive and monopolistic course of conduct, Tesla owners would have similar maintenance and repair options as purchasers of gas- or hybrid-powered vehicles—*i.e.*, they would be able to service their vehicles themselves, at an independent repair shop, or at an authorized dealership. Such competition would inevitably increase supply and lower prices.

93. Instead, Tesla vehicle owners are forced to buy Tesla Service and Tesla Parts only from Tesla. Not only has this resulted in Tesla owners paying artificially inflated prices for Tesla Service and Tesla Parts, but they also have been forced to suffer exorbitant wait times in receiving those parts and services from Tesla as discussed herein.

94. Elon Musk, Tesla's CEO and self-proclaimed "Technoking," acknowledged Tesla's service-related shortcomings via Twitter: "Just reviewed Tesla's service locations in North America & realized we have major gaps in geographic coverage! Sorry for this foolish oversight." (Twitter, @elonmusk, Oct. 16, 2018 at 6:30 p.m.).

95. The shortcomings in Tesla service are widely documented. There are thousands of consumer complaints filed with the FTC about Tesla, many of which "discussed specific problems with service, delays, and parts."[68] As further elaborated upon in a report by Recode, "[t]he

---

[68] https://www.vox.com/recode/23318725/tesla-repair-mechanic-delay-electric-vehicles-ev (last accessed March 28, 2023).

complaints point to all sorts of problems with the experience of owning a Tesla vehicle, including an inadequate number of service centers, limited stock of replacement parts, bad communication, poor manufacturing quality, and long wait times for repair appointments."[69]

96.     Assuming one can get a service appointment, the cost of maintaining and repairing a Tesla is higher than it should be:

> The two biggest problems with repairing a Tesla are the wait time and cost. Owners often wait weeks and even months for simple jobs to be finished. When an owner does get their car repaired, the costs are often outlandish. [One right-to-repair advocate] said that some shops charge upwards of $200 an hour for labor alone. The advocate further noted, "Imagine coughing up $200 an hour for a diagnostic fee. That's McLaren prices."[70]

97.     While Tesla charges $200 an hour or more for Tesla Repair Services, the average hourly rate for mechanic work in the United States is between $75 and $130.[71]

98.     In addition to the higher labor costs, Tesla replacement parts are also more expensive than they would otherwise be but for Tesla's anticompetitive conduct. For example, a brand new OEM front drive unit for the electric Ford Mustang Mach-E (Part#: 7B000) can be purchased directly from Ford for $2,094.28.[72] Tesla's online catalog, by comparison, states that the front drive unit assembly for the Model 3 (Part # 1120960-10-H) is "Restricted." However, a used Tesla front drive unit sells online for $9,500.[73]

99.     Taking labor and parts both into account, it should come as no surprise that maintenance costs for Tesla's are higher than other motor vehicles. The average cost to maintain a

---

[69] *Id.*

[70] https://www.vice.com/en/article/93wy8v/newly-passed-right-to-repair-law-will-fundamentally-change-tesla-repair (last accessed March 28, 2023).

[71] *See* https://www.repairsmith.com/blog/how-much-does-mechanic-charge-per-hour/ (last accessed March 28, 2023).

[72] https://parts.ford.com/shop/en/us/engine/engine-electrical/drive-13813527-1 (last accessed March 28, 2023).

[73] https://stealthev.com/product/tesla-front-drive-unit/ (last accessed March 28, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  Tesla vehicle is $832 per year, whereas the average cost for all motor vehicles sold in the United

2  States is only $652 per year.[74]

3      100.    The lack of supply and higher prices are compounded by Tesla's practice of simply

4  replacing parts or whole assemblies instead of devising repairs to address the issue.

5      101.    For example, according to one Tesla service employee speaking to a reporter who

6  test drove a Model Y, "the company only allows the service center to replace whole sections of the

7  interior, and not replace small parts (and even then, many small parts cannot be removed/replaced

8  at all without replacing the whole thing)."[75]

9      102.    In addition, it is widely discussed on Tesla forums that 2018 and earlier Model S

10  Performance models have a defective rear-drive unit containing a faulty seal that often results in a

11  small leak, causing the part to fail.[76] Although a small handful of independent repair shops have

12  apparently engineered an inexpensive fix for this problem, Tesla tells owners of these vehicles that

13  the cost of replacing the rear-drive unit is $7,500 and, oftentimes, recommends that the owner

14  "scrap" the car.[77]

15      103.    Moreover, one Tesla Model 3 lessee accidentally drove over some road debris which

16  then struck and damaged the vehicle's coolant system, causing coolant to leak from the battery pack.

17  After towing the vehicle to a Tesla service center, the lessee was informed that the damage was not

18  covered by warranty, that the battery could not be repaired and would need to be replaced, and that

19  the cost of the replacement was $16,000. Later, the lessee was put in contact with an independent

20  repair shop that had seen this issue before and devised a fix costing only $700.[78]

21

22  _____

23  [74] *See* https://jalopnik.com/advisor/tesla-maintenance-cost/ (last accessed March 28, 2023).

     [75]     https://cleantechnica.com/2021/05/02/tesla-model-y-big-family-test-mostly-good-but-there-
24  might-be-one-death-star-type-weakness/ (last accessed March 28, 2023).

25  [76]    *See*    https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-replacement-and-
     cost.226436/ (last accessed March 28, 2023).

26  [77]    *See*   https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-failure-service-center-
27  recommends-to-scrap-the-car.273103/ (last accessed March 28, 2023).

     [78]   *See*   https://getjerry.com/insights/costly-tesla-fix-shows-right-to-repair-matters#a-tesla-drivers-
28  dilemma (last accessed March 28, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

104.    These examples demonstrate how the lack of independent repair shops and inability to access parts directly impact Tesla vehicle owners.

## IV.    There are No Legitimate, Procompetitive Reasons for Tesla's Right-to-Repair Opposition

105.    As discussed above, Tesla refused to sign the right-to-repair Memorandum of Understanding and actively opposes and fights right-to-repair legislation.

106.    In opposing the Massachusetts legislation, Tesla sent a letter to its Massachusetts customers urging them to vote against the initiative, arguing, among other things, that the measure would make vehicles vulnerable to cyber-attacks.[79] Tesla provided no evidence to substantiate this claim.

107.    In a recent report to Congress regarding the impact of repair restrictions on consumers and independent repair shops, the FTC addressed the arguments made by manufacturers generally, not specific to Tesla, to justify their repair restrictions. Ultimately, the FTC's extensive investigation found "there is scant evidence to support manufacturers' justifications for repair restrictions."[80] In addition to cybersecurity, the FTC addressed and refuted several other concerns identified by manufacturers in defending their repair restrictions, including safety, quality of service, liability/reputational harm, and consumer's design preferences.

108.    With respect to cybersecurity, the FTC found that "[t]he record contains no empirical evidence to suggest that independent repair shops are more or less likely than authorized repair shops to compromise or misuse customer data."[81]

109.    With respect to safety, the FTC noted that there was no factual support for manufacturers' assertions that "authorized repair persons are more careful or that individuals or

[79] *See* https://fighttorepair.substack.com/p/teslas-a-vocal-opponent-of-the-right (last accessed March 28, 2023).

[80] *See* Nixing the Fix: An FTC Report to Congress on Repair Restrictions, at p. 6, n.249 https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (last accessed March 27, 2023).

[81] *Id*. at p. 31.

1  independent repair shops fail to take appropriate safety precautions, or that independent repair

2  workers who enter homes pose more of a safety risk to consumers than authorized repair workers."[82]

3      110.    With respect to quality of service, the FTC pointed to a Consumer Reports survey

4  indicating that "consumers who used independent repair shops were more satisfied with repairs than

5  those who used factory service," as well as a submission by the Auto Care Association that noted

6  "70-75% of consumers use independent repair shops due mostly to trust, convenience, and price,"

7  before concluding "[t]he record does not establish that repairs conducted by independent repair

8  shops would be inferior to those conducted by authorized repair shops if independent repair shops

9  were provided with greater access to service manuals, diagnostic software and tools, and

10 replacement parts as appropriate."[83]

11     111.    With respect to liability/reputational harm, the FTC described how, despite asking

12 for data on the assertions made by manufacturers, "[m]anufacturers provided no empirical evidence

13 to support their concerns about reputational harm or potential liability resulting from faulty third

14 party repairs."[84]

15     112.    Finally, with respect to purportedly consumer-driven design choices, the FTC noted

16 that "[r]ight to repair advocates argue that consumers care about repairability, in addition to aesthetic

17 design, but do not have the necessary information at the point of sale to purchase products that are

18 repairable."[85]

19 **V.    Interstate Trade and Commerce**

20     113.    Tesla's anticompetitive conduct has taken place in, and negatively affected the

21 continuous flow of, interstate trade and commerce in the United States in that, among other things,

22 it has:

23          a.    Sold electric vehicles, Tesla Service, and Tesla Parts to customers online and

24 through its physical store locations throughout the United States;

---

[82] *Id.* at p. 28.

[83] *Id.* at p. 38.

[84] *Id.* at p. 33.

[85] *Id.* at p. 34.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1          b.      Used the instrumentalities of interstate commerce to provide such goods and

2 services throughout the United States;

3          c.      In furtherance of its anticompetitive scheme alleged herein, traveled between

4 states and exchanged communications through interstate wire communications and via the United

5 States mail; and

6          d.      Through the anticompetitive scheme alleged herein, affected billions of

7 dollars of commerce.

**VI.    Antitrust Injury**

114.   Tesla's anticompetitive conduct had the following effects, among others:

a.      Competition has been restrained or eliminated with respect to Tesla Service and Tesla Parts, thus depriving purchasers of Tesla Service and Tesla Parts of the benefits of free and open competition;

b.      The prices paid for Tesla Service and Tesla Parts have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

c.      In addition to paying artificially inflated prices, purchasers of Tesla Service and Tesla Parts have suffered long wait times to receive parts and services.

115.   The purpose and effect of this anticompetitive course of conduct was to exclude competition and raise, fix, or maintain the price for Tesla Service and Tesla Parts. As a direct and foreseeable result, Plaintiff and the proposed Class paid supracompetitive prices for Tesla Service and Tesla Parts during the Class Period.

116.   By reason of the antitrust violations alleged herein, Plaintiff and the proposed Class have sustained injury to their businesses or property, and as a result have suffered damages.

117.   These injuries—the payment of supracompetitive prices—are of the type that the antitrust laws were intended to compensate and prevent.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLASS ACTION ALLEGATIONS**

118.    Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) as representative of the following Class:

> All persons or entities in the United States who paid Tesla for Tesla Repair Services or Tesla-Compatible Parts from March 2019 to the present (the "Class Period").

119.    Excluded from the Class are Tesla, any entity in which Tesla has an interest, any of Tesla's parents, subsidiaries, affiliates, officers, directors, legal representatives, successors and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

120.    Plaintiff reserves the right to modify this definition and/or to propose subclasses, as appropriate, based on further investigation and discovery.

121.    This action is being brought and may be properly maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Federal Rule of Civil Procedure 23(b)(3).

122.    <u>Numerosity</u>. The members of the proposed Class are so numerous that joinder of all members would be impracticable. The exact number of Class members is unknown to Plaintiff at this time, but it is estimated to number in the hundreds of thousands. The identity of Class members is readily ascertainable from Tesla's records.

123.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the proposed Class because Plaintiff paid Tesla for Tesla Service and Tesla Parts during the Class Period, and his claims arise from the same anticompetitive course of conduct by Tesla.

124.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class members. Plaintiff is represented by attorneys experienced in the prosecution of class action litigation generally, and in antitrust litigation specifically, who will vigorously prosecute this action on behalf of the Class.

125.    <u>Common Questions of Law and Fact Predominate</u>. Questions of law and fact common to the Class members predominate over questions that may affect only individual Class

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  members because Tesla has acted on grounds generally applicable to the Class. The following
2  questions of law and fact are common to the Class and predominate over any individual issues:

3          a.      Whether Tesla is a monopolist in the United States Electric Vehicle market;

4          b.      Whether Tesla is a monopolist in the United States Tesla Service market;

5          c.      Whether Tesla is a monopolist in the United States Tesla Parts market;

6          d.      Whether Tesla designed its warranty- and related-policies to discourage Tesla
7  owners from obtaining Tesla Service or Tesla Parts from anyone other than Tesla;

8          e.      Whether Tesla designed its vehicles such that maintenance and repairs
9  require access to diagnostics and telematics accessible only through remote management tools
10  exclusively accessed by Tesla;

11          f.      Whether Tesla unreasonably restricted access to its manuals, diagnostic tools,
12  vehicle telematic data, and OEM replacement parts;

13          g.      Whether Tesla used its contracts with OEM parts manufacturers to prevent
14  other, non-OEM parts manufacturers from producing Tesla Parts;

15          h.      Whether Tesla's course of conduct was anticompetitive;

16          i.      Whether Tesla's course of conduct constitutes an unreasonable restraint of
17  trade;

18          j.      Whether, absent Tesla's course of conduct, independent repair shops would
19  have entered the Tesla Service or Tesla Parts markets in the United States;

20          k.      Whether market entry by other participants would have encouraged
21  competition, resulting in lower prices or greater supply of Tesla Service or Tesla Parts in the United
22  States; and

23          l.      Whether Tesla's conduct should be enjoined or whether other appropriate
24  equitable relief is warranted.

25        126.    <u>Superiority</u>. A class action will permit numerous similarly situated persons to
26  prosecute their common claims in a single forum simultaneously, efficiently, and without
27  unnecessary duplication of evidence, effort, or expense. A class action will provide injured persons
28  a method for obtaining redress on claims that could not practicably be pursued individually. Plaintiff

1    knows of no manageability or other issue that would preclude maintenance of this case as a class

2    action.

3        127.    Injunctive relief. Tesla has acted or refused to act on grounds generally applicable to

4    the Class, making injunctive and corresponding declaratory relief appropriate with respect to the

5    Class as a whole.

6                              **CLAIMS FOR RELIEF**

7                                  **CLAIM ONE**

8                    **VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

9            **Monopolization of the Tesla Parts Market on behalf of the Class**

10       128.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully

11   set forth herein.

12       129.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits "monopoliz[ation of] any part

13   of the trade or commerce among the several states, or with foreign nations."

14       130.    Tesla has monopoly power in the Electric Vehicle, Tesla Service, and Tesla Parts

15   markets, including the ability to control prices and exclude competition in those markets.

16       131.    Tesla willfully and intentionally engages in predatory, exclusionary, and

17   anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly

18   in the Tesla Parts market.

19       132.    This anticompetitive conduct, which has unreasonably restrained and threatens to

20   continue unreasonably restraining competition in the Tesla Parts market, includes at least the

21   following:

22           a.    Implementing vehicle warranties and other policies designed to actively

23   discourage Tesla vehicle owners from obtaining Tesla Parts other than those offered by and through

24   Tesla, thus tying the purchase of Tesla Parts to the purchase of Tesla vehicles;

25           b.    Limiting access to its manuals, diagnostic tools, vehicle telematic data, and

26   OEM and non-OEM replacement parts; and

27           c.    Using its contracts with OEM parts manufacturers to limit the availability of

28   Tesla Parts from any source other than Tesla.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

133.   As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Parts, experiencing parts shortages and long wait times in receiving Tesla Service and Tesla Parts, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of utilizing Tesla Parts from sources other than Tesla to service, repair, and maintain their Tesla vehicles.

**CLAIM TWO**

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

**Attempted Monopolization of the Tesla Parts Market on behalf of the Class**

134.   Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

135.   Even assuming Tesla did not have monopoly power in the Tesla Parts market (it does), at a minimum Tesla has a dangerous probability of success in acquiring monopoly power in that market.

136.   Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla Parts market.

137.   Tesla's predatory, exclusionary, and anticompetitive conduct alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to monopolize the Tesla Parts market. The unlawful objective of Tesla's attempt to monopolize the Tesla Parts market is to control prices and restrain competition.

138.   As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Parts, experiencing parts shortages and long wait times in receiving Tesla Service and Tesla Parts, and being generally deprived of the competitive benefits

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    which otherwise would have resulted from the option of utilizing Tesla Parts from sources other

2    than Tesla to service, repair, and maintain their Tesla vehicles.

3                                   **CLAIM THREE**

4                **VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

5         **Monopolization of the Tesla Service Market on behalf of the Class**

6         139.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully

7    set forth herein.

8         140.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits "monopoliz[ation of] any part

9    of the trade or commerce among the several states, or with foreign nations."

10        141.    Tesla has monopoly power in the Electric Vehicle, Tesla Service, and Tesla Parts

11   markets, including the ability to control prices and exclude competition in those markets.

12        142.    Tesla willfully and intentionally engages in predatory, exclusionary, and

13   anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly

14   in the Tesla Service market.

15        143.    This anticompetitive conduct, which has unreasonably restrained and threatens to

16   continue unreasonably restraining competition in the Tesla Service market, includes at least the

17   following:

18        a.    Implementing vehicle warranties and other policies designed to actively

19   discourage Tesla vehicle owners from obtaining Tesla Service other than those offered by and

20   through Tesla, thus tying the purchase of Tesla Service to the purchase of Tesla vehicles;

21        b.    Designing its vehicles such that most maintenance and repairs require access

22   to diagnostics and telematics accessible only through remote management tools exclusively

23   accessed by Tesla; and

24        c.    Limiting access to its manuals, diagnostic tools, vehicle telematic data, and

25   OEM and non-OEM replacement parts.

26        144.    As a direct and proximate result of Tesla's anticompetitive and monopolistic

27   conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the

28   type the antitrust laws were intended to prevent, including, among other things, paying

1 supracompetitive prices for Tesla Service, experiencing shortages of available service appointments
2 and long wait times in receiving Tesla Service, and being generally deprived of the competitive
3 benefits which otherwise would have resulted from the option of servicing, repairing, and
4 maintaining their Tesla vehicles themselves or through independent repair shops.

**CLAIM FOUR**

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

**Attempted Monopolization of the Tesla Service Market on behalf of the Class**

145. Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

146. Even assuming Tesla did not have monopoly power in the Tesla Service market (which it does), at a minimum, Tesla has a dangerous probability of success in acquiring monopoly power in the market.

147. Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla Service market.

148. Tesla's predatory, exclusionary, and anticompetitive conduct as alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to monopolize the Tesla Service market. The unlawful objective of Tesla's attempt to monopolize the Tesla Service market is to control prices and restrain competition.

149. As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Service, experiencing shortages of available service appointments and long wait times in receiving Tesla Service, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their Tesla vehicles themselves or through independent repair shop.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

**CLAIM FIVE**

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**

**Unlawful Tying on behalf of the Class**

150.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

151.    An unlawful tying arrangement exists, and constitutes a per se violation of Section 1 of the Sherman Act, where a seller conditions the sale of a good or service in one market in which the seller has market power (the "tying" product) upon the buyer's agreement to (a) buy a second good or service (the "tied" product) from the seller or (b) refrain from buying that same good or service from a competing seller.

152.    Tesla electric vehicles, Tesla Service, and Tesla Parts are all separate and distinct products and services. Tesla has monopoly market power in all three markets.

153.    Moreover, consumers cannot reasonably estimate the total aggregate cost of all Tesla Repair Services and Tesla-Compatible Parts that will need to be purchased over the lifetime of their Tesla vehicles at the time of purchase, and Tesla affirmatively gives consumers the false impression that this total aggregate cost will be lower than for other motor vehicles.

154.    By virtue of the anticompetitive conduct alleged herein, Tesla has engaged in three separate tying arrangements.

155.    First, Tesla leverages its market power in the Electric Vehicle market (*i.e.*, the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla Service and Tesla Parts (*i.e.*, the tied products and services) only from Tesla, thus restraining competition in those markets and excluding other sellers of the tied products and services.

156.    Second, Tesla leverages its market power in the Tesla Parts market (*i.e.*, the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla Service (*i.e.*, the tied services) only from Tesla, thus restraining competition in the Tesla Service market and excluding other sellers of Tesla Service.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

157.    Third, Tesla leverages its market power in the Tesla Service market (*i.e.*, the tying product) to coerce Plaintiff and the proposed Class into purchasing Tesla Parts only from Tesla, thus restraining competition in the Tesla Parts market and excluding other sellers of Tesla Parts.

158.    All three of these tying arrangements affected a substantial amount of interstate commerce and Tesla has a substantial economic interest in sales of Tesla vehicles, Tesla Service, and Tesla Parts.

159.    There are no legitimate procompetitive business justifications for Tesla's unlawful tying arrangements.

160.    In the event that Tesla's anticompetitive course of conduct is not deemed to be a per se violation of Section 1 of the Sherman Act, it also constitutes a violation under both the rule of reason and a "quick look" analysis, as an observer even with a rudimentary understanding of economics could readily conclude that the conduct in question has had an anticompetitive effect on, and unreasonably restrained competition in, the markets for Tesla Service and Tesla Parts.

161.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiff and the proposed Class have suffered, and will continue to suffer, injuries of the type that the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Service and Tesla Parts, experiencing shortages and long wait times in receiving Tesla Service and Tesla Parts, and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their Tesla vehicles themselves or through independent repair shops.

### CLAIM SIX

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2302, § 102(C)**

**Prohibited Warranty Tying on behalf of the Class**

162.    Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein.

163.    The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*. ("MMWA"), creates a civil cause of action for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter." 15 U.S.C. § 2310(d)(1).

164.   The amount in controversy of Plaintiff's and each member of the proposed Class's individual claims is greater than $25 and the cumulative sum of all of their claims is greater than $50,000. Plaintiff does not bring this cause of action for failure to comply with an obligation under a written or implied warranty; rather, he brings this cause of action on behalf of himself and the proposed Class for Tesla's violation of the MMWA's rules governing the contents of warranties.

165.   Section 102(c) of the MMWA prohibits warrantors of consumer products from conditioning warranties "on the consumer's using, in connection with such product[s], any article or service (other than article or service provided without charge under the terms of the warranty) which is defined by brand, trade, or corporate name," unless the warrantor obtains a waiver from the FTC. 15 U.S.C. § 2302(c).

166.   Section 700.10 of the Code of Federal Regulations provides further guidance as to the types of tying conduct prohibited by Section 102(c) of the MMWA. It states in relevant part:

> No warrantor may condition the validity of a warranty on the use of only authorized repair service and/or authorized replacement parts for non-warranty service and maintenance (other than an article of service provided without charge under the warranty or unless the warrantor has obtained a waiver pursuant to section 102(c) of the Act, 15 U.S.C. 2302(c).

167.   As an example, Section 700.10 further states "a provision in the warranty such as, 'use only an authorized "ABC" dealer' or 'use only "ABC" replacement parts,' is prohibited where the service or parts are not provided free of charge pursuant to the warranty."

168.   While Tesla's warranties do not expressly require that Tesla vehicle owners utilize only Tesla Service or Tesla Parts purchased from Tesla, Tesla makes it clear that this is an implicit requirement by, among other things, "strongly recommend[ing]" that all services be performed and parts purchased from Tesla and threatening to void warranty coverage if they are purchased elsewhere.

169.   Similarly, Tesla's parts warranty only extends coverage if the parts are purchased directly from Tesla through its website or purchased and installed by Tesla itself, further preventing Tesla owners from having their vehicles serviced by independent repair shops.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

170.     The purpose and effect of these statements and policies is to communicate to Tesla vehicle owners that, in order to maintain warranty coverage, they must purchase all non-covered Tesla Service and Tesla Parts from Tesla.

171.     As a direct and proximate result, Plaintiff and the Class have sustained injury to their businesses or property, and as a result have suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully request that the Court:

A.      Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiff and Plaintiff's attorneys to represent the Class.

B.      Adjudge and decree that misconduct alleged herein violates Sections 1 and 2 of the Sherman Act, and Section 102(c) of the Magnuson-Moss Warranty Act.

C.      Grant injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including, among other things: (i) an order permanently enjoining and restraining Tesla, and its officers, directors, agents, servants, employees, attorneys, and all other persons acting or claiming to act on their behalf from continuing to engage in the wrongful acts described herein; and (ii) requiring Tesla to provide access to manuals, diagnostic tools, and vehicle telematic data, at a reasonable cost, to individuals and independent repair shops.

D.      Award damages to Plaintiff and the Class to the maximum amount allowed, and that judgment in favor of Plaintiff and the Class be entered against Tesla in an amount to be trebled to the extent the laws permit.

E.      Award pre- and post-judgment interest, as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint.

F.      Award Plaintiff and the Class their reasonable costs and expenses incurred in this action, including legal fees and expert fees.

G.      Grant such other and further relief as the Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all claims so triable.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  DATED: March 31, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON WARSHAW, LLP

By: _____ /s/ Daniel L. Warshaw _____
DANIEL L. WARSHAW

DANIEL L. WARSHAW (Bar No. 185365)
 dwarshaw@pwfirm.com
MICHAEL H. PEARSON (Bar No. 277857)
 mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone:     (818) 788-8300
Facsimile:     (818) 788-8104

JILL M. MANNING (Bar No. 178849)
 jmanning@pwfirm.com
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, California 94111
Telephone:     (415) 433-9000
Facsimile:     (415) 433-9008

*Attorneys for Plaintiff and the Class*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403